(No. 4923- ▮▮▮▮▮▮▮▮)

BURTON HOSEY, Claimant, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed May 11, 1965.*

McCONNELL, KENNEDY, McCONNELL AND MORRIS, Attorneys for Claimant.

145

WILLIAM G. CLARK, Attorney General; LAWRENCE W. REISCH, JR., Assistant Attorney General, for Respondent.

PEZMAN, J.

This is an action by claimant, Burton Hosey, against respondent, the State of Illinois, under the Structural Work Act for personal injuries sustained by claimant when he fell from a scaffold under the Cedar Street Bridge owned by the State of Illinois on August 28, 1959. Claimant's cause is based upon certain statutes, being Secs. 60, 63 and 69 of Chap. 48, 1959 Ill. Rev. Stats., which are set forth as follows:

"Sec. 60. Scaffolds, cranes, ladders, etc.—erection and construction. That all scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this state for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or any other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon.

"Scaffold, or staging, swung or suspended from an overhead support more than twenty (20) feet from the ground or floor shall have, where practicable, a safety rail properly bolted, secured and braced, rising a (at) least thirty-four inches above the floor or main portion of such scaffolding or staging, and extending along the entire length of the outside and ends thereof, and properly attached thereto, and such scaffolding or staging shall be so fastened as to prevent the same from swaying from the building or structure . . .

"Sec. 63. Inspection—Notice—Alteration and reconstruction—Free access—Devices regulated. Whenever it shall come to the notice of the Director of Labor or the local authority in any city, town or village in

this State charged with the duty of enforcing the building laws, that the scaffolding or the slings, hangers, blocks, pulleys, stays, braces, ladders, irons or ropes of any swinging or stationary scaffolding, platform, or other similar device used in the construction, alteration, repairing, removing, cleaning, or painting of buildings, bridges, or viaducts within this State are unsafe or liable to prove dangerous to the life or limb of any person, the Director of Labor or such local authority or authorities shall immediately cause an inspection to be made of such scaffolding, platform or device, or the slings, hangers, blocks, pulleys, stays, braces, ladders, irons or other parts connected therewith. If, after examination, such scaffolding, platform or device or any of such parts is found to be dangerous to the life or limb of any person, the Director of Labor or such local authority shall at once notify the person responsible for its erection or maintenance of such fact, and warn him against the use, maintenance or operation thereof, and prohibit the use thereof, and require the same to be altered and reconstructed so as to avoid such danger. Such notice may be served personally upon the person responsible for its erection or maintenance, or by conspicuously affixing it to the scaffolding, platform, or other such device, or the part thereof declared to be unsafe. After such notice has been so served or affixed, the person responsible therefor shall cease using and immediately remove such scaffolding, platform, or other device, or part thereof, and alter or strengthen it in such manner as to render it safe.

"The Director of Labor or such local authority, whose duty it is under the terms of this act to examine or test any scaffolding, platform, or other similar device, or part thereof, required to be erected and maintained by this section, shall have free access at all reasonable hours to any building, structure or premises containing such scaffolding, platform, or other similar device, or parts thereof, or where they may be in use. All swinging and stationary scaffolding, platforms, and other devices shall be so constructed as to bear four times the maximum weight required to be dependent therein, or placed thereon, when in use, and such swinging scaffolding, platform or other device shall not be so overloaded or overcrowded as to render the same unsafe or dangerous . . .

"Section 69. Penalties—recovery of damages—attorney's fees. Any owner, contractor, subcontractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any buildings, bridge, viaduct or other structure within the provisions of this Act, shall comply with all the terms thereof, . . . for any injury to person or property, occasioned by any wilful violation of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; and in case of loss of life by reason of such wilful violation or wilful failure as aforesaid, a right of action shall accrue to the widow of the person so killed, his lineal heirs or adopted children, or to any other person or persons who were, before such loss of life, dependent for support on the person or persons so killed, for a like recovery of damages for the injuries sustained by reason of such loss of life or lives."

Claimant contends that respondent knowingly or wilfully failed to comply with such statutes in one or more of the following respects:

(a) Failed to maintain the said scaffolding or staging in a reasonable and safe condition, when it knew or by the exercise of reasonable care ought to have known that the scaffolding or staging was unsafe and improper and dangerous to the life and limb of workmen employed on said scaffolding or staging as was this claimant.

(b) Neglected and failed to inspect the said scaffolding or staging when in the exercise of ordinary care this respondent knew or ought to have known that an inspection of said scaffolding or staging would reveal it to be in an unsafe condition for the purposes for which it was being used by this claimant.

(c) Neglected and failed to provide adequate safeguards in accordance with said statute.

(d) Neglected and failed to require the said Neumann and Co. to build and maintain the scaffold or staging in a safe and reasonable manner so as to prevent injury to persons such as this claimant.

(e) Knowingly permitted the erection and construction on its premises of a scaffold or staging that was not erected and constructed in a safe, suitable and proper manner, and was not so erected, constructed and placed as to give proper and adequate protection to the life and limb of this claimant employed or engaged thereon in that it was constructed so that it swung from an overhead support more than twenty feet from the ground and no hand rails were provided therefor, contrary to the statute.

Respondent contends that, in order for the State of Illinois to be liable under the Structural Work Act, it must have been in charge of the work being performed at the time of the occurrence in question, and states that this is the question of fact to be decided by the Court or a jury. Respondent further contends in a second point that it should be allowed to offset against any award, which might be made by the Court of Claims, any money which the claimant may have received under the Workmen's Compensation Act.

On August 28, 1959, claimant, then 34 years of age and weighing 230 pounds, was employed by the Neumann Com-

pany, a painting and sandblasting contractor. The company was employed to paint the Cedar Street Bridge in Peoria, Illinois. At the time of the accident, they were working on the Peoria side of said bridge. It is not disputed that the bridge was owned by the State of Illinois. The claimant had worked as a painter and sandblaster for about six years. At 8:00 A.M. on the day of the accident, the claimant was instructed by his Superintendent to go up on the scaffolding constructed by his employer to do some painting. The scaffold in question consisted of 3 needle beams, made of wood, 4 inches square and 20 or 24 feet in length, suspended from the bridge by cables. One needle beam was suspended from each side of the bridge and one from the center. Two picks (or platforms) ran from the needle beams to each side of the bridge, and rested on the outer needle beams. These picks were 36 inches wide and 24 feet long, constructed like a ladder, but with board coverings being attached to the rungs. The picks were laid across the needle beams, and from the evidence it does not appear that they were tightly lashed or tied to them. The entire scaffold was about 40 feet above the ground. Claimant had just stepped onto one of the picks, when one of the outside needle beams broke, causing him to fall about 40 feet onto hard compacted ground. The evidence indicates that each needle beam was hung by a steel cable, but with no reinforcing cable under the body of the beam. It was further developed that none of the wooden needle beams in use on this particular job were reinforced with a wire cable around the top and bottom and the ends of the beams to prevent their breaking. Claimant testified that he had worked on other jobs similarly rigged, but on those jobs, if wooden needle beams were used, they were reinforced by steel cable, or that needle beams made of steel pipe were used. It is further shown that the pick on which claimant was standing at the time of the accident was not equipped with guard rails, and there were

no nets beneath the scaffold. Claimant also stated that on other jobs on which he had worked, safety belts had been provided, which could be attached to the structure on which they were working.

Paul Kjelshus, a resident engineer of the Division of Highways of the State of Illinois, was called as an adverse witness by claimant. He testified that, at the time of the accident on August 28, 1959, he was an Engineering Technician II of the State Division of Highways of the Department of Public Works and Buildings; that since June 17, 1957, he had been an inspector for the State of Illinois, and, that his duties were to see that the jobs were done in accordance with the contract provisions. He testified that the State of Illinois owned the Cedar Street Bridge on the date of the accident, and that he was an inspector at that time, and on that date that his other duties with reference to the Cedar Street Bridge were to see that the job and the working conditions proceeded in a safe and proper manner. He testified that it was his duty to inspect safety measures at the Cedar Street Bridge and on other bridge jobs being done for the State, and that one of his duties was to see that proper safety measures were taken for the welfare of the men on the job. Kjelshus testified that on August 28, 1959, he arrived at the Cedar Street Bridge at about 7:50 A.M., and that before that date he had inspected the operation almost every day since it had started. He further stated that his superiors were also at the job, and that his duties required him to get under and upon the bridge, and to report to his superiors from time to time about what was going on at the job. Kjelshus' testimony included a statement by him that he was aware of the so-called Scaffolding Act, and knew that it was in force. He stated that he was responsible for the total conduct of the work of painting and sandblasting the Cedar Street Bridge on August 28, 1959. On that date,

he was on the bridge, heard something break, and saw Mr. Hosey fall. He testified that he determined that the needle beam, which was made of wood, broke.

Subsequently, the same Paul Kjelshus was called as a witness for respondent. Upon such direct examination, he stated that he was the engineer on this job, and, as such, was responsible for its execution. He first saw the needle beam, which broke, at 8:00 A.M. on the morning of the accident. It was constructed of Douglas fir, 4 inches by 4 inches and 20 feet in length, and was apparently in a good and dry condition. He stated that he knew what the needle beam was to be used for, but did not know when the board arrived on the job. He asked the Superintendent on the job if he was sure the beam was in satisfactory condition, and told Mr. Doremus, Superintendent for the Neumann Company, that he did not like the looks of the board, and asked him not to use it. He stated that about three or four feet from the end there was a small indentation like a knot. He further testified that the board did not break at the point of the knot, but broke in a long slant or diagonal break, not in the small defect that he had noticed. Kjelshus testified that he had registered a complaint to the Superintendent about the particular board, but that the Superintendent used it anyway. He stated that he had seen picks with guard rails on single installations, but didn't believe that guard rails on the pick would have prevented the fall, if the needle beam broke. He testified that claimant could have ridden the pick down, hanging on to the rail, but whether he could have prevented himself from being injured was another story. His testimony further disclosed that a loose strand of rope was wrapped around the pick and the needle beam, but not tightly lashed, and that the needle beam was attached to cables running through the ends, but not underneath the wood. He further stated that

the custom and usage of the business is to use a needle beam of suitable material, if it has been determined by testing to be satisfactory — steel cable, a pipe needle beam, oak needle beam, or a fir beam with a cable support. Upon cross-examination by claimant's counsel, Kjelshus testified that he had the authority to stop work on a job, call the whole group off for grounds that he considered proper, and that he had the authority to tell Mr. Hosey what to do. He also stated that he had the authority to tell the Superintendent what to do, and when to do it, but did not give orders to the workmen.

Upon redirect by the Attorney General, Kjelshus was asked, "Did you have the authority to direct details of the operation on this project? In other words, could you tell Mr. Hosey whether to go upon a paint ladder or not?" The witness answered, "I believe I have the authority to tell a man what to do, I believe." He further stated that he didn't actually give orders to the workmen, but could tell the Superintendent to tell the men what to do, and when to do it.

Clifford Doremus was called as a witness by respondent, and testified that he was Superintendent for the Neumann Company, and in charge of the operations on the job at the Cedar Street Bridge in Peoria; that he instructed Burton Hosey, claimant, to go to the area from which he fell. He stated that he saw the needle beam, which broke, before it was put up, that he had ordered it, and was there when it was tested, although he did not test it personally. Doremus further stated that he knew fifteen or twenty contractors who use them all the time, and that he had used them for twenty to twenty-five years, and this was the first one that he had seen break in twenty-five years. Upon further questioning, it was developed that he was using supporting wires for his wood needle beams. Doremus

admitted that Paul Kjelshus, the State Inspector, had mentioned to him that there was a knot in the end of the needle beam. The witness stated that guard rails would not have prevented the accident, but the pick was still hanging and the needle beam was still hanging immediately thereafter by the ropes, which had supported them originally. Upon cross-examination, Doremus admitted that after the accident he put cables around all of his wood needle beams because that made them stronger, and, although they might crack, they would not break off, and that, even if they cracked or broke, it would give you enough warning to grab hold of something. He stated that he did not see the accident occur, and that the State Inspector did not tell him not to use the beam that broke.

Walter Jacobs was called as a witness for respondent, and testified that he was a bridge painter foreman for the Neumann Company, and, as such, was so engaged on August 28, 1959 at the Cedar Street Bridge project. He said that he saw Hosey on the job that morning, and was with him when he went over to the scaffold from one pier to the other. He said the needle beam, which broke, had been used a week, and was tested at the lumber yard by jumping on it on all four sides. Upon cross-examination by claimant's counsel, Jacobs admitted that the particular beam had a small knot in it, and that he did not know whether the particular beam was tested or not. He also stated that the State Inspector, Paul Kjelshus, was on the Cedar Street Bridge job every day, and inspected all of the scaffolding that was rigged up.

This Court is charged with the responsibility of determining whether claimant has sustained his burden of proving that respondent was in charge of, and was in control of the work being performed on the Cedar Street Bridge job, and whether or not respondent was guilty of

a wilful violation of the Structural Work Act. Sec. 60 of Chap. 48, as set forth hereinabove, requires that all scafholds for use in painting a bridge shall be erected and constructed in a safe, suitable, and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon. It further states, "Scaffold, or staging, swung or suspended from an overhead support more than twenty (20) feet from the ground or floor, shall have, where practicable, a safety rail properly bolted, secured and braced, rising at least thirty-four inches above the floor or main portion of such scaffolding or staging, and extending along the entire length of the outside and ends thereof, and properly attached thereto, and such scaffolding, or staging, shall be so fastened as to prevent the same from swaying from the building or structure." Sec. 69 of the same act provides that any owner shall comply with all the terms thereof, for any injury to persons or property, occasioned by any wilful violation of the act, or wilful failure to comply with any of its provisions, a right of action shall accue to the party injured. From the evidence submitted, as contained in the transcript and the exhibits, there can be no doubt that the scaffold from which claimant fell was not in compliance with the provisions of the Structural Work Act. Testimony clearly develops that the scaffold was over twenty feet above the ground, had no guard rail, and that there was some question as to the safety of the structure (needle beam) used.

Ownership of the Cedar Street Bridge was established by the admission of respondent and the testimony of witnesses, and, as such an owner, respondent is bound by the provisions of the Structural Work Act. (Chap. 48, Ill. Rev. Stats. Sec. 69). See *Kennerly* vs. *Shell Oil Co.*, 13 Ill. 2d 431. The testimony of witness Paul Kjelshus, State Inspector, and

Clifford Doremus, Superintendent of the Neumann Company established that respondent was in charge of the project and the work being performed at the time of the accident, which is the basis for the cause of action. Respondent made no attempt to refute or even impeach the testimony of its own employee, and did not introduce into evidence its contract with the Neumann Company to establish its independence from supervision of the project. By the evidence contained in the transcript, it is clear that respondent had full and complete knowledge of the scaffold being used, its nature, and its potential for safety. This same evidence indicates that the State Inspector, Paul Kjelshus, had objected to the use of the needle beam, which broke, and further had the authority (from his own testimony) and control of the project to stop the use of the scaffold. This is enough knowledge to create "wilful" disregard of the provisions of the Structural Work Act. *Kennerly* vs. *Shell Oil Co.*, 13 Ill. 2d 431. *Schultz* vs. *Henry Ericsson Co.*, 264 Ill. 156. It was the duty of the State Inspector to see that proper safety measures were taken for the welfare of the men working on the job. He was responsible for the conduct of the work, including the method in which it was done, and he had the authority to stop the job by his own testimony. He had knowledge that the needle beam, which ultimately broke, was being used, and he even inquired of the contractor's Superintendent to determine if the same was in satisfactory condition. He testified that he didn't want the Superintendent to use the beam, but it was used anyway; and further testified that he had the authority to stop the use of the same.

The argument of respondent touches upon the question of contributory negligence or assumption of the risk. These defenses are not available under the Structural Work Act. *Thomas* vs. *Carroll*, 14 Ill. App. 2d 205; *Fetterman* vs. *Pro-*

*duction Steel Company of Illinois,* 4 Ill. App. 2d 403, and *Kennerly vs. Shell Oil Co.,* 13 Ill. 2d 431. The Fetterman case states that the Structural Work Act imposes a statutory liability in case of wilful failure to comply with the act upon the owner, contractor and sub-contractors. The object of the act is to prevent injuries to persons employed in dangerous and extra hazardous occupations, so that negligence on their part in the manner of doing their work might not prove fatal.

Respondent urges the Court to adopt a policy, which would allow the State of Illinois a credit or set-off of amounts received by claimant under the Workmen's Compensation Act. In effect, respondent is asking this Court to grant to the State of Illinois special privileges under the law, which would not be available to the private owner who might be a defendant in a cause under the Structural Work Act in the Circuit Court of any County in this State. In nearly every instance where a cause of action is brought under the Structural Work Act against an owner, Plaintiff has also been entitled to and has probably obtained an award under the Workmen's Compensation Act of the State of Illinois. This point was precisely settled in the case of *Bryntesen* vs. *Carroll Construction Co.,* 36 Ill. App. 2d 167, decided on June 19, 1962. In the Bryntesen case, defendants asserted that the Workmen's Compensation payments to the plaintiff should have been admitted into evidence. This was also a case that arose under the Structural Work Act. In its opinion at page 182, The Court stated: "We do not find any case in this State permitting the receipt of a Workmen's Compensation award paid by the employer to diminish the damages recoverable against a third party tort feasor for his wrong-doing." The Appellate Court in the Bryntesen case cited with approval the case of *O'Brien* vs. *Chicago City Railway Co.,* 305 Ill. 244, in which the Supreme Court said:

"No injustice is done to a person negligently injuring another in requiring him to pay the full amount of damages for which he is legally liable without deduction for compensation which the injured person may receive from another source, which has no connection with the negligence, whether that source is a claim for compensation against his employer, a policy of insurance against accidents, a life insurance policy, a benefit from a fraternal organization or a gift from a friend." Affirmed in 27 Ill. 2d 566 at 568.

The injuries to the Claimant were of such a serious nature that they can best be described by extracting from the record the language of Dr. James J. Flaherty, the orthopedic surgeon who treated claimant on August 28, 1959, and on many occasions thereafter until he left St. Francis Hospital in Peoria. Dr. Flaherty testified that the x-ray exhibits showed a fracture and dislocation of the left ankle with fusion of the joint at the ankle level, surgically done; that there was some distortion about the lower end of the tibia. He stated that claimant's exhibit No. 19 shows the right ankle with distortion of the lower end of the tibia, and some backward displacement of the tibia with relation to the foot; that there may not be complete union at the side of the fusion, and that the x-ray also shows a healed fracture through the calcaneous. Claimant's exhibit No. 20 shows the left wrist and a portion of the hand, with a healed fracture of the distal end of the radius with some shortening of the radius, some dorsal displacement of the wrist joint, and some irregularity of the joint line. Dr. Flaherty stated that the fractures shown in exhibits Nos. 18 and 19 would interfere with the normal function of these members, and would also interfere with the normal function of the left wrist. He stated that claimant's exhibit No. 21 is a side view of the claimant's left femur, and that it shows a fracture of the upper middle third with three screws securing the frag-

ments and the intramedullary pin in place. The doctor testified that this injury would interfere with the normal function of the leg. He stated that claimant's exhibit No. 22 was a front to back view of claimant's left femur showing the three screws, the intramedullary pin and the united fracture. He stated that exhibit No. 23 is an AP view of claimant's pelvis and hip joints, and that it shows a healed fracture of the transverse process of the fifth lumbar vertebra, and a completely healed fracture of the pubis and pelvis with normal contour.

Dr. Flaherty testified as to the general treatment of all of claimant's injuries on August 28, 1959, and thereafter until the said patient was transferred to another hospital. He stated that he examined the patient again on September 28, 1960, and examined him clinically and by x-ray, and at that time he had some shortening of the right radius with obvious deformity of the wrist; that he had 30° flexion of the wrist compared to a normal of 70° to 90°; that he had 10° extension of the wrist compared to a normal of 70° to 90°; and, that there was deformity of the contour of the wrist, and that the pathology he found would interfere with the normal function of the hand, wrist, and arm, including his ability to life and do manual labor. The doctor stated that all of these conditions were permanent.

Dr. Flaherty further testified that an examination of the left leg showed a one and one-half inch shortening, and further, that, when the leg was held in external rotation, the foot could not be brought back past the neutral position. There was distortion of the left ankle, and there was distortion with healed scars, which were also over the buttocks and outer aspects of the left thigh. He stated that these findings would interfere with the normal use of the left leg and foot, and interfere with his ability to walk or climb, do manual labor, and were all permanent. He further testified

that there was a healed scar over the anterior aspect of the right ankle, and there was perhaps some motion at the ankle, but no rotation of the right foot. He stated that claimant needed a cane to assist him in walking, and that this condition was also permanent. Stipulation by counsel indicates that the medical and hospital expenses of claimant amounted to $9,177.12.

Claimant testified that prior to the accident he was in good health, and had never sustained any fractures; that his job with Neumann Company paid him $3.50 per hour, and that he could work a 40 hour week. Claimant testified that he had an eighth grade education, and no trade except that of a common laborer; that he did not work from the date of the accident on August 28, 1959, until January 1, 1961, when he opened up a service station in Tullahoma, Tennessee. He further testified that he was not able to do much at the station, because he could not be on his feet, but was able to pump some gas and make change. He stated further that he earned about $40.00 per week, net, from the operation of the station, as compared with $140.00 per week, which he earned prior to the accident.

The Court finds that claimant has sustained the burden of proving that respondent was guilty of a wilful violation of the Structural Work Act, and grants him an award of $25,000.00.

WILLIAM G. CLARK, Attorney General; LAWRENCE W. REISCH, JR., Assistant Attorney General, for Respondent.